UNITED STATES of America,

v.

Daniel A. CORBIN, Defendant.

No. 09 Cr. 0463(VM).

United States District Court,
S.D. New York.

Oct. 21, 2010.

Joan M. Loughnane, Reed Michael Brodsky, U.S. Attorney's Office, New York, NY, for Plaintiff.

---

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

In this action, the Government charged Daniel Corbin ("Corbin") with one count of conspiracy to commit securities fraud and six substantive counts of securities fraud for illicitly trading on material, nonpublic information. Corbin has filed a motion to dismiss the charges pursuant to rules 12(b)(2) ("Rule 12(b)(2)") and 12(b)(3)(B) ("Rule 12(b)(3)(B)") of the Federal Rules of Criminal Procedure. For the reasons detailed below, Corbin's motion is DE-NIED.

## I. BACKGROUND [1]

### A. THE MATERIAL, NONPUBLIC IN-FORMATION AND THE ALLEGED CONSPIRATORS

The securities fraud, and conspiracy to commit securities fraud, alleged in the Indictment centers around Corbin's alleged criminal trading based on material, nonpublic information that he and co-conspirator Jamil Bouchareb ("Bouchareb") received from Matthew Devlin ("Devlin"). Corbin and Bouchareb were securities day traders who worked together in Miami Beach, Florida. Devlin was employed as a sales representative in a multinational investment bank and broker-dealer located in New York, New York. The Government alleges that, from early 2005 through September 2008, Corbin and Bouchareb obtained material, nonpublic information from Devlin about numerous impending acquisitions of publicly-traded companies (the "Information") and used it to illicitly execute trades. The Government further asserts that Devlin procured the Information in violation of duties of trust and confidence to his wife ("Devlin's Wife"), and that Corbin was aware both that the Information was confidential and that Devlin breached these duties in using it to tip Corbin and Bouchareb.

### B. DEVLIN OBTAINS THE INFOR-MATION AND, IN VIOLATION OF DUTIES, PASSES IT TO CORBIN AND BOUCHAREB

Devlin had an intimate source for material, nonpublic information on imminent public market transactions. Devlin's Wife worked for an international communications firm (the "Communications Firm") that provided services to companies in con-

---

1. Unless otherwise stated, the factual summary described below is derived from superseding indictment S2 09 Cr. 463, dated April 6, 2010 (the "Indictment" or "Ind.").

The Court accepts these facts as true for the purposes of ruling on a motion to dismiss an indictment. *See United States v. Velastegui*, 199 F.3d 590, 592 n. 2 (2d Cir.1999).

nection with their mergers, acquisitions, and similar transactions. In the course of her work, Devlin's Wife became familiar with the Information.

Corbin and Bouchareb referred to Devlin's Wife as the "Golden Goose" because she was able to produce precious information about publicly-traded companies prior to its public announcement. In April 2005, Bouchareb sent an instant message to Devlin stating that "we need the goose to pop its head out and show us the biz." (Ind.¶ 11.) In August 2006, Corbin exchanged instant messages with Devlin during which Devlin stated "we need some goose stuff," that "none [was] out there now," and Corbin responded "ya we do." (*Id.* ¶ 26(i).)

Both the Communications Firm and Devlin's Wife were aware of the Information's value and potential improper use. Thus, the Communications Firm had confidentiality policies in place, and distributed them to its employees. These policies made clear that each employee had a duty to maintain the confidentiality of nonpublic information related to the firm's clients to which they were privy.

Devlin too was well aware of the Information's value and confidentiality. Accordingly, he and his wife had a domestic confidentiality policy of sorts. "Devlin agreed [with his wife] and understood that he could not use or share any confidential information entrusted to the Communications Firm by its clients that Devlin obtained or learned from his wife." (*Id.* ¶ 18.) In addition to his express agreement, the Government asserts that "Devlin and his wife had a history, pattern, and practice of sharing and maintaining confidences such that Devlin knew and reasonably should have known that his wife expected that he would maintain the

confidentiality of any material nonpublic information he obtained from her." (*Id.* ¶ 18.)

The Government asserts that it will seek to establish at trial that in breach of duties of trust and confidence to his wife that arose out of their express agreement and their history, pattern, and practice of sharing and maintaining business confidences in the course of their spousal relationship, from early 2005 through about September 2008, Devlin regularly misappropriated the Information from his wife and provided it to others, including Corbin and Bouchareb, so that they could engage in unlawful profitable transactions.[2] In exchange for Devin's tips, tippees Corbin and Bouchareb provided him with thousands of dollars of cash payments and gifts.

## C. CORBIN AND BOUCHAREB EXECUTE SECURITIES TRADES BASED ON THE INFORMATION

Corbin and Bouchareb, along with other alleged securities fraudsters and co-conspirators, entered into profitable securities trades prior to the public announcements of anticipated transactions using the Information, earning hundreds of thousands of dollars in unlawful profits. The Government asserts that Corbin knew that the information provided to him by Devlin was material and nonpublic, and further knew that Devlin procured it in breach of his duties to his wife. On or about September 4, 2008, during a telephone conversation between Devlin and Bouchareb, Devlin stated that "we need to make sure that we have a back story on any of these deals that I've given you from [my wife]," and Bouchareb responded "right, right, right—don't worry we're on it" and later stated "don't worry—lots of homework." (*Id.* ¶ 26(y).)

---

**2.** While Corbin is the defendant/tippee in this case, the alleged misappropriator/tipper was Devlin.

### D. THE GOVERNMENT CHARGES DEVLIN, BOUCHAREB, AND CORBIN

On December 16, 2008, in a distinct, earlier action (*see United States v. Devlin,* 08 Cr. 1307 (S.D.N.Y.), the Government charged Devlin with both securities fraud and entering into a conspiracy with Corbin and Bouchareb to commit securities fraud. The next day, the Government filed a sealed complaint against Corbin and Bouchareb, charging them with seven counts of securities fraud and one count of conspiracy to commit securities fraud. (*See United States v. Bouchareb and Corbin,* 08 Mag. 2777 (S.D.N.Y.).) The day after that, Devlin pled guilty to one substantive count of securities fraud and four counts of conspiracy to commit securities fraud pursuant to a cooperation plea agreement.

On May 5, 2009, Bouchareb, pursuant to a non-cooperation plea agreement, waived indictment and pled guilty to one substantive count of securities fraud and one count of conspiracy to commit securities fraud with Corbin and Devlin. (*See United States v. Jamil A. Bouchareb and Daniel A. Corbin,* 09 Cr. 463 (S.D.N.Y.).) Less than a month later, on June 2, 2009, Corbin waived indictment and entered a plea of not guilty to information S1 09 Cr. 463. (*Id.*) On April 6, 2010, a grand jury returned the instant charges against Corbin in the form of a superseding indictment, charging him with six counts of securities fraud and one count of conspiracy to commit securities fraud. (*Id.*)

## II. DISCUSSION

### A. LEGAL STANDARD UNDER RULE 12(b)(2) AND RULE 12(b)(3)(B)

Corbin seeks dismissal of the Indictment under Rule 12(b)(2) and Rule 12(b)(3)(B). Rule 12(b)(2) permits "[a] party [to] raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R.Crim.P. 12(b)(2). Rule 12(b)(3)(B) states that a defendant must raise before trial "a motion alleging a defect in the indictment or information...." Fed. R.Crim.P. 12(b)(3)(B).

■ "An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). To be valid on its face, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti,* 541 F.3d 112, 127 (2d Cir.2008) (quotation marks omitted); *see also Hamling v. United States,* 418 U.S. 87, 118, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (holding that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.").

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso,* 143 F.3d 772, 777 (2d Cir.1998); *see also United States v. Villanueva Madrid,* 302 F.Supp.2d 187, 192 (S.D.N.Y.2003). Instead, "fact questions raised by an Indictment are the province of the jury...." *See, e.g., United States v. Pirro,* 96 F.Supp.2d 279, 283 (S.D.N.Y. 1999).

### B. LEGAL BACKGROUND

#### 1. Trading Based on Material, Nonpublic Information in Violation of Federal Securities Law

The instant charges are grounded in § 10(b) of the Securities Exchange Act of

1934 ("Section 10(b)" or "§ 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5, promulgated pursuant that act. Section 10(b) reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to its § 10(b) rulemaking authority, the United States Securities and Exchange Commission (the "SEC") adopted Rule 10b–5, which, in relevant part, prohibits any individual or entity from "employ[ing] any device, scheme, or artifice to defraud" or "engag[ing] in any act ... which operates ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ While not narrowly targeted at trading on material, nonpublic information, § 10(b) and Rule 10b–5's broad general prohibition against fraud in connection with securities transactions proscribes many, but not all, forms of insider trading. Indeed, trading on material, nonpublic information alone does not constitute securities fraud. *See Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *United States v. O'Hagan,* 521 U.S. 642, 661, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). To violate § 10(b) and Rule 10b–5 in the insider trading context, "[t]here must also be manipulation or deception." *Dirks v. Securities and Exchange Commission,* 463 U.S. 646,

654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (quotation marks omitted).

■ In the federal securities context, for fraud in the form of manipulation or deception to exist, there must be a breach of a duty to another in connection with the purchase or sale of a security. *See O'Hagan,* 521 U.S. at 661, 117 S.Ct. 2199; *United States v. Chestman,* 947 F.2d 551, 570 (1991) ("[F]requently the core inquiry in a Rule 10b–5 criminal conviction ... [is] whether a fiduciary duty has been breached."). "When an allegation of fraud is based upon nondisclosure [of inside information before trading], there can be no fraud absent a duty to speak." *Chiarella,* 445 U.S. at 235, 100 S.Ct. 1108. "A duty arises from the relationship between parties and not merely from one's ability to acquire information because of his position in the market." *Id.* at 232 n. 4, 100 S.Ct. 1108 (citation omitted). Accordingly, "[b]efore liability, civil or criminal, may be imposed for a Rule 10b–5 violation, it is necessary to identify the duty that the defendant has breached." *Id.* at 237, 100 S.Ct. 1108 (Stevens, J., concurring).

Illegal trading that uses material, nonpublic information falls under one of two recognized theories of insider trading: the traditional (or classical) theory or the misappropriation theory. Whether a fraudster's actions fall under the former or the latter is largely determined by the breached duty at issue. While the Government's allegations against Corbin are based solely on the misappropriation theory, a brief overview of the traditional theory and tipper-tippee liability, in addition to misappropriation theory, provides context to Corbin's arguments and the Court's analysis.

2. *Classical Theory*

■ Pursuant to the traditional theory,

an insider[3] violates § 10(b) and Rule 10b–5 when he purchases or sells shares in a company he owns or acts as an agent of, based on material, nonpublic information. *See O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199. Trading on the inside information constitutes a "deceptive device" under § 10(b) and Rule 10b–5 because " 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.' " *Id.* (*quoting Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108) (alteration in original). This relationship " 'gives rise to a duty to disclose [the inside information to the uninformed shareholders or to abstain from trading] because of the necessity of preventing a corporate insider from ... tak[ing] unfair advantage of ... uninformed ... stockholders.' " *Id.* at 652, 117 S.Ct. 2199 (*quoting Chiarella,* 445 U.S. at 228–229, 100 S.Ct. 1108) (ellipses in original) (internal quotation marks omitted)).

### 3.  *Tipper and Tippee Liability*

Insiders may also be prosecuted for securities fraud for tipping others to trade on inside information. Tippees too, under certain circumstances, are subject to prosecution for trading based on tipped information that ultimately can be traced back to an insider. The tippee's duty to disclose the insider's information or abstain from trading is inextricably tied to, pursuant to the classical theory, the tipper's fraud on his company's shareholders. *See Dirks,* 463 U.S. at 659, 103 S.Ct. 3255 ("[T]he tippee's duty to disclose or abstain is derivative from that of the insider's duty."); *id.* at 662, 103 S.Ct. 3255 ("[A]b-

sent a breach by the insider, there is no derivative breach."); *id.* at 664, 103 S.Ct. 3255 ("[T]here must be a breach of the insider's fiduciary duty before the tippee inherits the duty to disclose or abstain."). "The tippee's obligation has been viewed as arising from his role as a participant after the fact in the insider's breach of a fiduciary duty." *Id.* at 659, 103 S.Ct. 3255 (*discussing Chiarella* ) (quotation marks and alteration omitted). Thus, the Supreme Court reasoned in *Dirks:*

> [A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.... Tippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information[.]

*Id.* at 660, 103 S.Ct. 3255 (citation, quotation marks, and alteration omitted)). "In determining whether a tippee is under an obligation to disclose [the material, nonpublic information] or abstain [from trading on it], it thus is necessary to determine whether the insider's 'tip' constituted a breach of the insider's fiduciary duty." *Id.* at 463 U.S. at 661, 103 S.Ct. 3255.

### 4.  *Misappropriation Theory*

■ Section 10(b) and Rule 10b–5's proscriptions on trading on material, nonpublic information are not limited to insiders (and their tippees) who trade and/or tip. In *O'Hagan,* the Supreme Court ex-

---

**3.** The case law defines an insider to include temporary insiders. *See O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199 ("The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation.").

pressly blessed the application of the anti-fraud provisions to prosecutions in which those who owe no duty to existing or potential shareholders in the company whose shares are being bought or sold, misappropriate material, nonpublic information in breach of a duty to the source of that information. *See* 521 U.S. at 650, 117 S.Ct. 2199 ("We hold ... that criminal liability under § 10(b) may be predicated on the misappropriation theory."). Under the misappropriation theory, "a person commits fraud in connection with a securities transaction, and thereby violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* at 652, 117 S.Ct. 2199 (quotation marks omitted); *Chestman*, 947 F.2d at 566 ("Under this theory, a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction."). The Supreme Court distinguished the classical insider trading theory from misappropriation theory, stating that "[i]n lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199; *id.* at 653–54, 117 S.Ct. 2199 ("A fiduciary who pretends loyalty to the principal while secretly converting the principal's information for personal gain, dupes or defrauds the principal." (quotation marks and citation omitted)). Thus, a misappropriator's deception is not of the purchaser or seller of the security, but of the source of the confidential information who was deceived. *See id.* at 651, 117 S.Ct. 2199.

## C. DUTIES IN THE MISAPPROPRIATION CONTEXT

### 1. Second Circuit Doctrine

Several years prior to *O'Hagan*, the Second Circuit adopted the misappropriation theory and opined on when a person owes duties to another in the misappropriation context. *See Chestman*, 947 F.2d at 564; *id.* at 567 (stating that the "central inquiry" was "what constitutes a fiduciary or similar relationship of trust and confidence [sufficient to give rise to a duty] in the context of Rule 10b–5 criminal [misappropriation] liability"). The Second Circuit made clear that a recognized duty can be established via several routes. The duty can arise from an express agreement. *Id.* at 571. It can also spring from a fiduciary relationship. *See id.* at 551; *id.* at 568 ("Counted among these hornbook fiduciary relations are those existing between attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder."). The duty can additionally spawn from a "relationship of trust and confidence [that is] the functional equivalent of a fiduciary relationship." *Id.* at 568.

### 2. SEC Enumerated Duties in Misappropriation Cases

After *Chestman* and *O'Hagan*, the SEC codified several of the duties that can support a misappropriation prosecution. *See* 17 C.F.R. § 240.10b5–2(b) ("Rule 10b5–2") (enumerating, in a non-exhaustive manner, operative "duties of trust or confidence" (quotation marks omitted)). Rule 10b5–2, entitled "[d]uties of trust or confidence in misappropriation insider trading cases," "appl[ies] to any violation of [§ 10(b) and Rule 10b–5] that is based on the purchase or sale of securities on the basis of ... material nonpublic information misappropriated in breach of a duty of trust or

confidence." *Id.* at § 240.10b5–2(a). Subsection (b)(1) of Rule 10b5–2 ("Rule 10b5–2(b)(1)") provides that such a duty exists "[w]henever a person agrees to maintain information in confidence." *Id.* at § 240.10b5–2(b)(1). Subsection (b)(2) of Rule 10b5–2 ("Rule 10b5–2(b)(2)") states that the obligation operates "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality." *Id.* at § 240.10b5–2(b)(2). Lastly, subsection (b)(3) of Rule 10b5–2 ("Rule 10b5–2(b)(3)") adds that the duty is present "[w]henever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling. . . ." *Id.* at § 240.10b5–2(b)(3).

## D. *THE CONSTITUTIONALITY OF THE APPLICATION OF THE MISAPPROPRIATION THEORY AGAINST CORBIN*

Painting with broad strokes, Corbin contends that the Government unconstitutionally applies the misappropriation theory in the instant case. He asserts that Rule 10b5–2 does not supply the legal basis for a fiduciary-like relationship. (*See* The Memorandum of Law in Support of Daniel A. Corbin's Motion to Dismiss [the] Indictment, dated May 5, 2010 ("Corbin's Moving Brief" or "Def.'s Moving Br."), at 15.) He also seeks dismissal because "the relationship alleged in the Indictment between the Devlins is not a recognized relationship sufficient for misappropriation liability to attach" because " 'marriage does not, without more, create a fiduciary relationship.' " (*Id.* at 12 (*quoting Chestman,* 947 F.2d at 568); *id.* (arguing that the application of misappropriation theory to him is uncon-

stitutional because the Devlins' relationship is not a fiduciary relationship as a matter of law).) The Court finds Corbin's argument unpersuasive.

### 1. *A Duty Based on an Agreement of Confidentiality*

■ As described above, Rule 10b5–2(b)(1) imposes a "duty of trust or confidence" that establishes a duty to abstain or disclose "[w]henever a person agrees to maintain information in confidence." 17 C.F.R. § 240.10b5–2(b)(1). The Indictment alleges that Devlin agreed to maintain the Information in confidence. (*See* Ind. ¶ 18 ("Devlin agreed . . . that he could not use or share any confidential information entrusted to the Communications Firm by its clients that Devlin obtained or learned from his wife.").) Corbin's Moving Brief does not challenge the sufficiency of the Indictment with regard to this express confidentiality agreement. Accordingly, the Court finds that the Indictment, on its face, sufficiently alleges a duty of trust or confidence for the purposes of maintaining a prosecution based on misappropriation theory under Rule 10b5–2(b)(1).

In accordance with case law, an express confidentiality agreement also gives rise to a duty. *See Chestman,* 947 F.2d at 571. Thus, despite Corbin's contention that "the relationship alleged in the Indictment between the Devlins is not a recognized relationship sufficient for misappropriation liability to attach," (Def.'s Moving Br. at 12 (*quoting Chestman,* 947 F.2d at 568)), and that, therefore, it would be unconstitutional to apply misappropriation theory to Corbin, the Court concludes that the Government adequately makes out a charge for illicit trading because "Devlin agreed . . . that he could not use or share any confidential information entrusted to the Communications Firm by its clients that Devlin

obtained or learned from his wife." (*See* Ind. ¶ 18.)

### 2. *A Duty Based on a History, Pattern, or Practice of Sharing Confidences*

■ Rule 10b5–2(b)(2) states that the obligation to abstain or disclose operates "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality." 17 C.F.R. § 240.10b5–2(b)(2). Here, the charges against Corbin, largely tracing the language of Rule 10b5–2(b)(2), assert that Devlin owed additional duties of trust and confidence to his wife, through a "history, pattern, and practice of sharing and maintaining confidences such that Devlin knew and reasonably should have known that his wife expected that he would maintain the confidentiality of any material nonpublic information he obtained from her." (Ind.¶ 18.) Thus, the Court finds that the Indictment also asserts a valid charge arising from this recognized basis for misappropriation liability.

Case law also allows for a wider range of actions that can give rise to a duty in the misappropriation context. A duty to disclose or abstain may exist, even absent a fiduciary relationship or an express confidentiality agreement, where there is a fiduciary-like relationship. *See Chestman,* 947 F.2d at 568 ("The misappropriation theory requires us to consider not only whether there exists a fiduciary relationship but also whether there exists a similar relationship of trust and confidence." (quotation marks omitted)). The Court examines below whether the Devlins had a "similar relationship of trust and confidence," *id.,* including one grounded in their

history, pattern, and practice of sharing business confidences (*see* Ind. ¶¶ 17–18), sufficient to serve as a predicate for criminal misappropriation liability.

### 3. *A Duty Based on a Spousal Relationship*

Under Rule 10b5–2(b)(3), a "duty of trust or confidence" exists whenever "a person receives or obtains material nonpublic information from his or her spouse. . . ." 17 C.F.R. § 240.10b5–2(b)(3). According to the Government, its theory of prosecution will include proof that "Devlin obtained material nonpublic information from his wife concerning the Communication Firm's Deals. . . ." (Ind.¶ 19.) Accordingly, the Court is persuaded that the Indictment adequately alleges a duty of trust or confidence under Rule 10b5–2(b)(3).

In addition to being codified by Rule 10b5–2(b)(3), the duty with which Corbin is charged has been adopted by the Second Circuit. While Corbin correctly points out that *Chestman* states that the mere status of being husband and wife does not "itself establish fiduciary status" as governed by Second Circuit case law, the case also cautions that the dynamic in certain marital relationships can constitute a fiduciary-like relationship. 947 F.2d at 571; *see id.* at 568. Indeed, Corbin acknowledges that " 'spouses certainly may by their conduct become fiduciaries.' " (Def. Moving Br. at 12 (*quoting Chestman,* 947 F.2d at 568).)

Corbin contends that the Devlins' relationship, as described in the Indictment, does not trigger a fiduciary-like relationship because the Indictment lacks any allegation of reliance by one spouse and domination and control by the other. (*See id.* at 11.) However, *Chestman* explicitly ruled that "the repeated disclosure of business secrets between family members may substitute for a factual finding of depen-

dence and influence and thereby sustain a finding of the functional equivalent of a fiduciary relationship." *Chestman,* 947 F.2d at 569; · see *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.1985), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985). The Indictment charges that the Devlins had a spousal relationship that involved the repeated disclosure of business secrets. (*See* Ind. ¶¶ 18–19.) Accordingly, the Court finds that the Government's allegations fall within the purview of behavior that, as alleged, demonstrates "the functional equivalent of a fiduciary relationship." *Chestman,* 947 F.2d at 569. Thus, the Court concludes that the Indictment here alleges a relationship between the Devlins sufficient to support a prosecution under misappropriation liability. This finding is based on several established doctrinal and statutory theories of misappropriation liability that apply to Corbin as Devlin's alleged tippee and co-conspirator.

E. *THE SEC'S AUTHORITY TO ENACT RULE 10b5–2*

Corbin next seeks to establish that Rule 10b5–2 is unconstitutional because the SEC exceeded its authority in promulgating it. Corbin's arguments are not compelling.

▆▆▆ The SEC promulgated Rule 10b5–2 by exercising its Congressionally-delegated rulemaking authority to carry out § 10(b)'s anti-fraud prohibitions. *See* 15 U.S.C. § 78j(b) (enabling the SEC to adopt "such rules and regulations as [it] may prescribe as necessary or appropriate in the public interest or for the protection of investors"). While courts review SEC regulations adopted pursuant to § 10(b)'s authority to ensure propriety, they nevertheless must generally provide that oversight with due deference to the administrative agency. *See Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Nat'l Cable & Telecomm. Association v. Brand X Internet Servs.,* 545 U.S. 967, 980–81, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); *United States v. Royer,* 549 F.3d 886, 899 (2d Cir.2008) (providing *Chevron* deference to SEC Rule 10b5–1 and *citing Roth ex rel. Beacon Power Corp. v. Perseus,* 522 F.3d 242, 249 (2d Cir.2008) for the proposition that "SEC rules are entitled to *Chevron* deference").

Corbin argues, however, that courts do not accord "an agency rule [deference] if Congress did not delegate authority to the agency regarding the subject matter of the rule," (Def.'s Moving Br. at 16), and that in this case the Court should not defer to the SEC's interpretations of duties under § 10(b) because "notions of fiduciary relationships are not within the expertise of the SEC," (*Id.* at 17). The Court is not persuaded. The scope of misappropriation duties relating to securities-inside-information disclosure (or abstention) requirements falls squarely within the SEC's power to "prescribe [rules] as necessary or appropriate in the public interest or for the protection of investors" delegated by Congress to the SEC in § 10(b). 15 U.S.C. § 78j(b). Therefore, the Court applies *Chevron* analysis to the instant case.

Pursuant to the *Chevron* framework, the court must defer to the SEC's construction of Section 10(b) as long as two criteria are met: (1) Congress has not "unambiguously forbidden" the SEC's interpretation and (2) the SEC's construction is premised on a permissible interpretation of the underlying statute. *Northpoint Technology v. Federal Communications Commission,* 414 F.3d 61, 69 (D.C.Cir.2005) ("Under *Chevron,* we defer to the [SEC's] interpretation of statutes which it is charged with implementing, so long as the Congress has not unambiguously forbidden it and it is otherwise permissible." (citation omitted));

*id.* ("This means that, if Congress 'has directly spoken to the precise question at issue,' we 'give effect to [its] unambiguously expressed intent'; 'if the statute is silent or ambiguous,' we defer to the [SEC's] interpretation so long as it is 'based on a permissible construction of the statute.' " (*quoting Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778)). With regard to the first prong, if the "plain terms" of the statute at issue omit to "directly address the precise question at issue" then the SEC interpretation of the text is not unambiguously forbidden. *Brand X*, 545 U.S. at 986, 125 S.Ct. 2688 ("At the first step, we ask whether the statute's plain terms 'directly address the precise question at issue.' " (*quoting Chevron*, 467 U.S. at 843, 104 S.Ct. 2778) (alteration omitted)). The statute at issue here, § 10(b), reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Thus, § 10(b) does not directly address the scope of the duties that, if breached through deception, may give rise to misappropriation liability. Accordingly, the Court concludes that Congress has not "unambiguously forbidden" the SEC interpretation of § 10(b) embodied in Rule 10b5–2. *Northpoint Technology*, 414 F.3d at 69.

"[A]t step two," under the permissibility aspect of *Chevron* analysis, courts "defer ... to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.' " *Brand X*, 545 U.S. at 986, 125 S.Ct. 2688 (*quoting*

*Chevron*, 467 U.S. at 845, 104 S.Ct. 2778). "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.* at 981, 104 S.Ct. 2778. Accordingly, courts are to accord agency constructions " 'controlling weight' unless the regulation is " 'arbitrary, capricious, or manifestly contrary to the statute.' " *Roth*, 522 F.3d at 249 (*quoting Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778)).

Rule 10b5–2 derived from *O'Hagan* and the adoption of misappropriation theory. Approximately two and half years after the Supreme Court's decision in *O'Hagan*, the SEC issued a proposing release with a section entitled "Rule 10b5–2: Duties of Trust or Confidence in Misappropriation Insider Trading Cases," with the proposed rules that it ultimately enacted in the form of Rules 10b5–2(b)(1), (2), and (3). *See* Selective Disclosure and Insider Trading, Exchange Act Release 42,-259, 64 F. Reg. 72,590, at 72,599–601 (Dec. 28, 1999) (the "Proposing Release"). The Proposing Release explicitly references *O'Hagan*, and its blessing of prosecutions stemming from misappropriation theory, stating that "[u]nder that theory, a person commits fraud in violation of Section 10(b) of the Exchange Act and Rule 10b–5 by misappropriating material nonpublic information for securities trading purposes, in breach of a duty of loyalty and confidence." *Id.* at 72,599–602. The SEC explained that it was proposing the rule because it "is not settled ... under what circumstances certain non-business relationships, such as family and personal relationships, may provide the duty of trust or confidence required under the misappropriation theory." *Id.* at 72,602. The agency further explained that the "broader approach" it was pursuing in Rule 10b5–2

was founded on its investigation and prosecution of a "large number of insider trading cases that involved trading by friends or family members of insiders," *id.*, and its concern that such familial insider trading "harms investor confidence in the integrity and fairness of the nation's securities markets." *Id.* at 72,603.

On this record, the Court finds that the SEC's exercise of its rulemaking authority to promulgate Rule 10b5–2 under § 10(b) is far from arbitrary, capricious, or contrary to § 10(b). Rather, it was buttressed by a thorough and careful consideration—one that far surpasses mere reasonableness—of the ends of § 10(b), the state of the current insider trading case law which included Supreme Court and Second Circuit decisions, and the need to protect investors and the market generally. Accordingly, the Court concludes that the SEC's construction of § 10(b) embodied in Rule 10b5–2 is " 'based on a permissible construction of the statute.' " *Northpoint Technology*, 414 F.3d at 69 (*quoting Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778).

### F. *THE CONSTITUTIONALITY OF THE PRESUMPTION PROVIDED IN RULE 10b5–2(b)(3)*

■ Corbin seeks to establish that "Rule 10b5–2(b)(3) is further illegal because, if applicable to Mr. Corbin, it improperly shifts the burden of proof to a criminal defendant to disprove the duty element of a misappropriation in certain familial situations." (Def.'s Moving Br. at 20.) This contention is unavailing. Rule 10b5–2(b)(3) provides as an affirmative defense that:

> [T]he person receiving or obtaining the [inside] information may demonstrate that no duty of trust or confidence existed with respect to the information, by establishing that he or she neither knew nor reasonably should have known that the person who was the source of the

information expected that the person would keep the information confidential, because of the parties' history, pattern, or practice of sharing and maintaining confidences, and because there was no agreement or understanding to maintain the confidentiality of the information.

17 C.F.R. § 240.10b5–2(b)(3). The mere overlap between the elements of a crime and the elements of an affirmative defense does not render the law proscribing the criminal conduct unconstitutional. *See, e.g., United States v. Thompson*, 76 F.3d 442, 453 (2d Cir.1996) ("[While] the elements of the crime and of the affirmative defense overlap, in the sense that evidence to prove the latter will often tend to negate the former, ... this overlap did not shift to [the defendant] the burden of proof on any element of the crime ..., nor did it allow the jury to presume elements of the government's case." (quotation marks and citation omitted)). Accordingly, the Court concludes that the affirmative defense provided in Rule 10b5–2(b)(3) does not shift from the Government its heavy burden to prove each element of illicit insider trading beyond a reasonable doubt at trial and thus does not render the statute unconstitutional.

### G. *THE LACK OF AN ALLEGATION OF AN IMPROPER STATEMENT*

■ In a footnote on the final page of his brief, Corbin includes an argument contending that "[a]lthough the Indictment charges Mr. Corbin with a violation of each of the three subparagraphs of Rule 10b–5, the Government has not alleged any improper statement by Mr. Corbin and therefore the charge related to Rule 10b–5(b) must be dismissed for failure to state a claim under Rule 12(b)(3)(B)." (Def.'s Moving Br. at 22, n. 16 (citation omitted).) Corbin has not cited any authority to support his contention that an insider trading prosecution must allege and prove an im-

proper statement. In fact, the crux of an insider trading prosecution is often the defendant's omission to make a statement, as opposed to the assertion of a statement, when under the duty to do so. *See In re Cady, Roberts & Company*, 40 S.E.C. 907, 1961 WL 59902 (1961) (setting forth the duty to abstain from trading on insider information or to disclose the information before trading and stating that "a breach of duty of disclosure may be viewed as a device or scheme, an implied misrepresentation, and an act or practice, violative of [Rule 10b–5]"). In violating this duty by failing to disclose inside information before trading, the perpetrator need not make a statement. *See, e.g., Chiarella*, 445 U.S. at 228, 100 S.Ct. 1108 ("[O]ne who fails to disclose material information prior to the consummation of a transaction [may] commit[ ] fraud [under § 10(b) and Rule 10b–5] . . . ."). Thus, the Government may maintain an insider trading prosecution without alleging that Corbin made any improper statement.

### H. *THE INDICTMENT'S ALLEGATIONS OF THE ELEMENTS OF AIDING AND ABETTING*

Lastly, Corbin asserts that "[t]he Indictment fails as a matter of law to establish an aiding and abetting violation" because "[t]he Indictment fails to allege the . . . elements and the facts giving rise to such a violation." (Def.'s Moving Br. at 22.) The elements of aiding and abetting in the securities context are "(1) existence of a securities violation by a primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abetter substantially assisted in the primary violation." *Securities and Exchange Commission v. Treadway*, 430 F.Supp.2d 293, 336 (S.D.N.Y.2006). The Indictment alleges that (1) primary violator Devlin illicitly tipped Bouchareb and Corbin by providing them with the Information; (2) Corbin

knew of Devlin's illicit actions; and (3) substantially assisted Devlin's infractions by trading on the Information and providing Devlin with payments in exchange for the Information. (*See* Ind. 19–22.) Thus, the Court concludes that the Government has sufficiently set forth an aiding-and-abetting violation against Corbin.

### III. *ORDER*

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion of defendant Daniel A. Corbin to dismiss the indictment in this action (Docket No. 56) is DENIED.

The parties are directed to appear at the previously-scheduled pretrial conference on November 5, 2010 at 2:00 p.m.

**SO ORDERED.**